IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MARIA PARMIGIANI-PINCHOTT,

    Plaintiff,

v.

NEXSTAR BROADCASTING, INC. A/K/A D/B/A FOX21 NEWS IN COLORADO
SPRINGS; NEXSTAR MEDIA GROUP, INC.; NEXSTAR MEDIA INC.; NEXSTAR INC.

    Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff, Maria Parmigiani-Pinchott (herein "Plaintiff" or "Ms. Parmigiani"), by and

through undersigned counsel, Stinar & Zendejas, PLLC, brings this action against Defendants

Nexstar Broadcasting, Inc. a/k/a d/b/a Fox 21 News in Colorado Springs, Nexstar Media Group,

Inc., Nexstar Media Inc., and Nexstar Inc. (collectively referred to as "Defendants") as follows:

### I. INTRODUCTION

1.      Plaintiff is a former employee for Defendants, who after successfully working for

Defendants for over two years, was terminated on June 24, 2020, the day after her FMLA leave

concluded, which had been approved so that Plaintiff could receive treatment for her own serious

health condition, an aggressive form of breast cancer.  At the time of her termination Plaintiff

was still on a Short-Term Disability leave and could perform work for Defendants.  Plaintiff

survived her breast cancer and brings this suit to address Defendants' unlawful conduct.

2.      On June 3, 2021, the Colorado Civil Rights Division ("CCRD") issued a

**Probable Cause determination**, finding that Nexstar discriminated against Plaintiff and

violated C.R.S. § 24-34-402 on the basis of her disability by: (1) failing to accommodate her disability; (2) terminating Plaintiff's employment because of her disability; and (3) retaliating against Plaintiff for engaging in protected activities.

3.      This action is brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (hereafter "ADA"), the ADA Amendments Act of 2008, Pub.L. No. 110–325 § 2(b)(1), 122 Stat. 3553–3554 (2008) (hereafter "ADAAA"), and the Family and Medical Leave Act (hereafter "FMLA"), 29 U.S.C. § 2601, *et seq.*, as interpreted by 29 C.F.R. § 825, *et seq.*

4.      Plaintiff also invokes this Court's supplemental jurisdiction to bring claims against Defendants under the Colorado Anti-Discrimination Act C.R.S. § 24-34-402 (hereafter "CADA"), which prohibits discrimination and retaliation on the basis of disability or perceived disability by employers with one or more employees, as well as Colorado state law tortious claims of, *inter alia*, misappropriation.

## II. JURISDICTION

5.      Jurisdiction is proper in the U.S. district court for the District of Colorado pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 42 U.S.C. § 12117, and 29 U.S.C. § 2617(a)(2). Upon information and belief, the district court has original jurisdiction by virtue of the parties being citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.  Upon information and belief, the district court has original jurisdiction by virtue of the claims arising under the ADA, ADAAA, and FMLA. Further, the district court has supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

## III. VENUE

6.    Venue is proper in the district of Colorado pursuant to 28 U.S.C. § 1391(b)(2) as the actions giving rise to this action occurred in the state of Colorado.

## IV. PARTIES

7.    Plaintiff is an individual who at the time of the events described resided in El Paso County, Colorado.

8.    Defendant Nexstar Broadcasting, Inc. a/k/a d/b/a Fox 21 News in Colorado Springs is a Texas corporation.

9.    According to the Colorado Secretary of State's website, on April 22, 2021, Nexstar Inc. changed its name to Nexstar Media Inc.

10.    According to Defendants' CCRD Position Statement filing, "Nexstar is part of Nexstar Media Group, Inc. ("Nexstar Media"). Nexstar Media is America's largest local television and media company with 198 full power stations (including partner stations) in 116 markets addressing nearly 63% of US television households and a growing digital media operation. Nexstar Media's platform delivers exceptional local content and network programming to inform and entertain viewers, while providing premium, scalable local advertising opportunities for advertisers and brands across all screens and devices. One of the local television stations Nexstar operates is KXRM-FOX21 in Colorado Springs, Colorado ("FOX21")."

11.    At the time of this filing, Nexstar Media Group, Inc. is a publicly traded company worth $6.38 Billion.

12.     At all relevant times and upon information and belief, Defendants employed well over 500 employees across the United States.

13.     Upon information and belief, Defendants were joint employers of Plaintiff and shared or co-determined matters governing the essential terms and conditions of Plaintiff's employment.

14.     Upon information and belief, Defendants directed, controlled, or maintained the right to control and supervise the administrative, managerial, and employment duties of Plaintiff.

15.     Upon information and belief, Defendants held authority, direction, and control over workers, such as Plaintiff, in her employment.

16.     For instance, at all relevant times, Jennifer Vansau, who held the title of Benefits Coordinator for Nexstar Media, administered leave of absences for local stations such as FOX21, did administer Plaintiff's FMLA leave of absence as described herein, and instructed FOX21 - pursuant to Nexstar Media's direction - to terminate Plaintiff's employment.

17.     Defendants jointly and without meaningful distinction responded to the CCRD during the CCRD's investigation of Plaintiff's CCRD complaint of discrimination.

### V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

18.     On August 30, 2021, the CCRD emailed, and Plaintiff subsequently received, a notice of dismissal of her matter which, as confirmed via a subsequent email, served as Plaintiff's "Notice of Right to Sue" for CCRD Charge No. E2100009300 (**Exhibit 1)** which pleaded actual and/or abetting discrimination and retaliation on the basis of disability and/or medical condition (actual or perceived), and failure to accommodate.  This Notice entitled Plaintiff to initiate this action within 90 days of receipt of said notice.

19.     On June 3, 2021, the CCRD issued a **Probable Cause determination** after thoroughly investigating Plaintiff's CCRD Charge No. E2100009300, finding that Nexstar discriminated against Plaintiff and violated C.R.S. § 24-34-402 on the basis of Plaintiff's disability by: (1) failing to accommodate her disability; (2) terminating Plaintiff's employment because of her disability; and (3) retaliating against Plaintiff for engaging in protected activities (**Exhibit 2**).

20.     Plaintiff has satisfied all private, administrative and judicial prerequisites necessary for this action.

## VI. GENERAL ALLEGATIONS

A.  <u>PLAINTIFF BEGINS HER EMPLOYMENT</u>.

21.     On or around January 8, 2018, Plaintiff began working for Defendants as a Lifestyle Host/Producer at Colorado Springs FOX21, reporting to station manager Joe Cole.

22.     Plaintiff's position included, inter alia:

   a.  conducting interviews of guests/clients in studio and on location;
   b.  providing on-camera contributions to the show;
   c.  assisting the Executive Produce with writing show segments;
   d.  collecting information, video or photos at remote locations for post-production;
   e.  greeting and assisting guests during show preparations;
   f.  researching show topics and developing questions for guests in coordination with Executive Producer;
   g.  attending daily show meeting;
   h.  assisting sales on presentations including meeting with clients:
   i.  participating in events –either station-sponsored or others – to promote the show; and
   j.  maintaining a show social media account and assisting with all online content as directed by the Executive Producer.

23.     Prior to this position, Plaintiff had experience in broadcasting and working for news stations.

24.     Throughout her tenure as Lifestyle Host/Producer, Plaintiff satisfactorily performed her duties, was very much liked and followed in Colorado Springs, and added goodwill and value to FOX21.

25.     On April 1, 2020, Plaintiff was approved for and began using FMLA leave, which was to last through June 23, 2020 as well as Defendants' Short-Term Disability ("STD") leave, which was approved through August 23, 2020.

26.     Plaintiff could (and did) report from home while she was on leave (Plaintiff had software downloaded on her computer to be able to work from home), and appeared on Defendants' April 27, 2020, broadcast to update viewers on her treatment and progress.

**UNCATEGORIZED**

# Maria Parmigiani's story, and journey of hope





by: Claudia Garofalo

Posted: Apr 27, 2020 / 02:26 PM MDT / Updated: Nov 16, 2020 / 02:02 PM MST

Available as of March 31, 2021, at https://www.fox21news.com/uncategorized/maria-parmigianis-story-and-journey-of-hope/.

27.     On June 24, 2020, the day after her FMLA leave ended (and while Plaintiff was still on Defendants' STD leave), Plaintiff was advised by co-workers[1] that Defendants' News Director, Joe Cole ("Mr. Cole"), stated that Plaintiff would not be returning to work for Defendants by falsely claiming Plaintiff had told Defendants' Human Resources Representative, Katrina Crawford ("Ms. Crawford"), that she did not intend to return to work.

28.     On June 24, 2020, upon learning the above information, Plaintiff was distraught, upset, and worried as at no time prior had Defendants mentioned or noticed Plaintiff of her termination, as on June 23, 2020 the parties spoke on the phone and confirmed that Plaintiff would not return physically to the office and would remain on STD despite her FMLA expiring.

29.      On June 24, 2020, upon learning the above information, Plaintiff contacted Ms. Crawford and Mr. Cole confirming she had no desire to leave her employment with Defendants; however, Ms. Crawford and Mr. Cole informed Plaintiff that it was too late, Defendants had begun processing her termination paperwork and that that Plaintiff's employment with Defendants was terminated.

30.     On June 24, 2020, Defendants confirmed Plaintiff's termination and sent Plaintiff an email confirming, "Your termination will be processed effective 7.01.2020 which will keep your company benefits active until 7.31.2020."

31.     On June 24, 2020, Defendants did not provide Plaintiff with a termination letter.

---

[1] Upon information and belief, Ms. Crawford threatened these co-workers with termination for informing Plaintiff of her termination.

32.     According to Defendants, it was Defendants' policy to terminate employees who had not returned to work when their FMLA leave concluded.

33.     Defendant terminated Plaintiff in retaliation for Plaintiff taking FMLA leave.

34.     At no time prior to June 24, 2020 did Defendants engage in an interactive process with Plaintiff to consider or determine whether reasonable accommodations, aside from her continued use of STD, could be provided to Plaintiff as an alternative to termination of her employment.

35.     At no time prior to June 24, 2020 did Defendants consider a reasonable accommodation, aside from her continued use of STD, that could be provided to Plaintiff as an alternative to termination of her employment.

36.     Regardless of Plaintiff being on STD, Defendants terminated her position.

37.     For instance, according to Defendants' FLMA policy:

> In certain circumstances, employees may take intermittent leave or leave on a reduced leave schedule. … Intermittent leave or leave on a reduced schedule may be taken when medically necessary to care for a seriously ill family member or because of the employee's own serious health condition.

38.     Upon information and belief, Defendants' STD and LTD policies contained provisions permitting an employee to engage in work, albeit under certain hour or earning restrictions (but not prohibitions), to encourage and allow employees to return to work as quickly as possible from an STD or LTD leave.

39.     At all relevant times on and after her termination (including on, after, and during Plaintiff's STD and LTD leave) Plaintiff could have worked for Defendants within the restrictions and limits set forth in the policies, but instead of offering accommodation, Defendants terminated Plaintiff's employment.

40.     For instance, on April 27, 2020, Plaintiff appeared on a segment of Living Local to provide information and content for Defendants and her fans, which represented the duties of her position.

41.     Further, and as an alternative to termination, Plaintiff could have performed remote work-related activities for Defendants including, but not limited to those duties articulated in Plaintiff's job description such as:

   a.   conducting interviews of guests/clients;
   b.   providing on-camera contributions to the show;
   c.   assisting the Executive Produce with writing show segments;
   d.   collecting information, video or photos at remote locations for post-production;
   e.   greeting and assisting guests during show preparations;
   f.   researching show topics and developing questions for guests in coordination with Executive Producer;
   g.   attending daily show meeting;
   h.   assisting sales on presentations including meeting with clients:
   i.   participating in events –either station-sponsored or others – to promote the show; and
   j.   maintaining a show social media account and assisting with all online content as directed by the Executive Producer.

42.     After June 24, 2020, Plaintiff's position with Defendants remained open and Defendants did not fill it, although allegedly Defendants began looking to fill the position shortly after Plaintiff was terminated.

43.     It is unknown whether Plaintiff's position was filled, but if it was, upon belief the person who replaced Plaintiff was less qualified, non-disabled, was hired at a lesser salary, and had not taken FMLA leave.

44.     At all relevant times, Defendants routinely and regularly allowed its employees, including on-air personalities, who were otherwise considered "in studio" to work remotely,

including reporting via video-connection from their own homes.  An example is Carly Moore, who worked at FOX21 in Colorado Springs during the relevant time period.  For almost a year Ms. Moore regularly worked for FOX21 from her home as an anchor/reporter, as seen in the below examples:

**July 21, 2020**



Available as of March 31, 2021, at https://www.facebook.com/CMooreNews/videos/you-dont-have-to-go-home-but-you-cant-drink-here/624027198495498/).

**March 1, 2021**



by: Carly Moore
Posted: Mar 1, 2021 / 06:43 PM MST / Updated: Mar 1, 2021 / 06:51 PM MST

Available as of March 31, 2021, at https://www.fox21news.com/health/coronavirus/cdphe-colorado-expected-to-get-45000-doses-of-jj-vaccine-in-first-week/ (Carly is reporting from "Carly's Home").

45. According to Defendants' Position Statement to the CCRD:

In compliance with the provisions of all applicable state and federal civil rights laws, Nexstar will make every effort to employ the most qualified individuals without regard to race, color, religion, disability, age, sex, national origin, citizenship, veteran's status, sexual orientation, military status or any other protected personal characteristic. Additionally, it is and shall continue to be Nexstar's policy to provide promotion and advancement opportunities within the Company in a nondiscriminatory fashion based on merit, qualifications and ability. Moreover, Nexstar prohibits any form of retaliation against individuals who report unwelcome conduct to the Company's management or who cooperate in the investigation of such reports in accordance with its Non-Discrimination & Anti-Harassment policy. ([attaching to the Position Statement], Nexstar's Equal Employment Opportunity, Non-Discrimination & Anti-Harassment Policies.)

46.     On August 1, 2020, Plaintiff began paying her COBRA premium to maintain her insurance while she continued to receive cancer treatments.

47.     Around September 29, 2020, Plaintiff's STD leave ended and Plaintiff's LTD leave began, given that Plaintiff was still treating for her breast cancer.

48.     Between June 24, 2020 and approximately March 2021, Defendants used and benefitted from the use of, without Plaintiff's consent, Plaintiff's name, image, and likeness in a variety of ways, including falsely advertising Plaintiff on social media (e.g., Facebook) and its website as a panelist on Living Local and falsely affiliating Plaintiff with Defendants despite the fact that she had been terminated.

49.     At all relevant times Plaintiff has been a person of notoriety, especially in and around Colorado Springs, Colorado, given her years of work as an on-air personality at FOX21.

50.     At all relevant times, FOX21 benefited from its association with Plaintiff, who had earned goodwill, notoriety, a liking, and a following from FOX21 viewers.

51.     On December 4, 2020, Plaintiff and Defendants engaged in an unsuccessful mediation with the CCRD.

52.     For months following her termination, Defendants kept Plaintiff on their social media, including the Living Local Facebook and Instagram pages, until around March 2021.

53.     For instance, as of December 17, 2020, Defendants' Instagram page presented Plaintiff as a Living Local member:

**Instagram**





December 17, 2020 Instagram Screenshots, with Plaintiff on the viewer's right.

**Facebook**





December 17, 2020 Facebook Screenshots, with Plaintiff on the viewer's right, as well as being listed as a "News Personality" on the right-sidebar.

54.     On January 12, 2021, without any material change to Plaintiff's status, and while Plaintiff was on LTD leave, Defendants offered Plaintiff a "reinstatement of employment to the position of Lifestyle Show Host" reporting to Mr. Cole, with a salary of $47,000 per year, which was NOT the same title as she held previously ("Lifestyle Host/Producer") and was offered for less than what Plaintiff had been previously promised to earn as of January 7, 2021, as described herein.  As such, Defendants' offer of reinstatement was not equivalent and not unconditional as Plaintiff was to take a demotion in title and pay in order to resume working for Defendants.

55.     In addition to her salary, which was $46,000 her first year (January 8, 2018 through January 7, 2019), $47,500 her second year (January 8, 2019 through January 7, 2020), and scheduled for $49,000 her third year (from January 8, 2020 through January 7, 2021), Plaintiff received benefits (e.g., 401k, 10 days of vacation pay, 10 days of sick pay, medical

insurance, dental insurance, life insurance, and over $10,000 worth of coaching, production, and promotion).

56.　　As of the date of this Complaint, Plaintiff estimates that at the time her LTD ended and beginning in September 2021, she should have received a salary of approximately $60,000 (given her positive status with the viewers and success as an on-air personality), plus all benefits valued at approximately 33% of her salary, or $80,000 per year, or $6,667 per month.

57.　　Plaintiff has been unable to find comparable work and does not expect to find comparable work for the next several years.

58.　　Upon information and belief, at all relevant times Plaintiff was on STD and LTD benefits, on and after June 24, 2020 through August 2021 (approximately 15 months), Plaintiff could while working for Defendants have earned up to 20% of her salary ($817 per month) and continued to receive her benefits, especially health insurance, valued at 30% of her salary ($1,225 per month), for a total of $30,630.

59.　　Plaintiff's out-of-pocket COBRA costs were about $2,000 per month, totaling approximately $24,000 for the year from August 2020.

60.　　On January 12, 2021, Defendants presented an "unconditional offer of reinstatement" to become a Lifestyle Host that upon review, was NOT an "unconditional offer" returning Plaintiff to the terms and conditions of her employment as a "Lifestyle Host/Producer" because she was offered a lower annual salary of $47,000 and lower title by not being a producer.

61.　　Plaintiff rejected Defendants offer of demotion in pay and title.

62.     As a consequence of Defendants' above-mentioned actions/failures, Plaintiff has suffered economic damage as follows: back wages and compensation; loss of economic opportunities and professional growth; loss of benefits either not available on the open market or otherwise prohibitively expensive; future lost wages and compensation, and other forms of economic harm.

63.     Plaintiff presently seeks past economic damages calculated through October 2021 of approximately $44,000, not including interest, as follows:

      a.   From June 24, 2020 through August 2021, as calculated above: $30,630.

      b.   From September 2021 through October 2021, as calculated above: $13,334.

64.     As a consequence of Defendants' above-mentioned actions/failures, Plaintiff has lost future income and career related income, growth, and opportunities, in amounts to be determined.  Plaintiff presently seeks future economic damages calculated as above, not including likely raises/bonuses, from November 2021 through October 2023 of approximately $160,000.

65.     As a consequence of Defendants' above-mentioned actions/failures, statutory interest has accrued on the sums of money due to Plaintiff but not paid by the Defendants, including unpaid wages and compensation, in amounts to be determined.

66.     As a consequence of Defendants' above-mentioned actions/failures, Plaintiff has suffered out-of-pocket losses, including but not limited to $24,000 of COBRA payments.

67.     As a consequence of Defendants' above-mentioned failures, Plaintiff has suffered significant emotional damages, including but not limited to the shock, shame, and embarrassment of being terminated while treating for cancer, amongst other emotional damages,

including but not limited to the emotional strain of being a single mother dealing with job loss

and cancer.  Defendants' termination was like a knife in Plaintiff's back while she was already

down, treating for cancer. Plaintiff presently seeks emotional damages two times her economic

damages from Defendants, or $450,000, subject to any statutory limitations.

68.     As a consequence of Defendants' above-mentioned failures/actions, Plaintiff

suffered damages from Defendants' unauthorized use of Plaintiff's name, image, and likeness for

approximately nine (9) months of time.

69.     Defendant's unauthorized use of Plaintiff's name, image, and likeness for a period

of at least nine (9) months is estimated to have enriched and/or benefitted Defendants in the

amount of approximately $100,000.

70.     Defendants' above-mentioned failures and actions were willful and done with

malice and with reckless disregard to Plaintiff's civil rights and Defendants' requirements under

the law.  Defendants engaged in unlawful discrimination that was intentional.  By terminating

Plaintiff the day after her FMLA leave ended, Defendants intended to send a message to other

employees not to take FMLA, or else you will be fired.  Defendants were aware of (or otherwise

recklessly ignored) that its actions violated Colorado and Federal law.  Defendants' failures are

despicable and reprehensible and should be punished by and through punitive damages levied

against Defendants.  To rub salt in this wound (and show further malice) Defendants continued

to misrepresent to the world for months that Plaintiff was still working with Defendants, in order

for Defendants to maximize the money it could make from Plaintiff's name, image, and likeness

– all without Plaintiff's consent.  Finally, Defendants are sizable, with over 500 employees

operating nationwide.  At the time of this filing, Nexstar Media Group, Inc. is a publicly traded company worth $6.38 Billion.

71.     Plaintiff presently seeks punitive damages proportionate to her economic and emotional damages from Defendants far in excess of $1,000,000.

72.     As a consequence of Defendants' above-mentioned failures, Plaintiff has been forced to retain counsel and pursue litigation, incurring costs and attorney's fees.

VII. CLAIMS OF RELIEF

**FIRST CLAIM OF RELIEF**
**ADA/ADAAA 42 U.S.C. § 12112(b)**
**Disability Discrimination, Retaliation, Failure to Accommodate**
**Against All Defendants**

73.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

74.     At all relevant times, Defendants qualified as Plaintiff's employers and Plaintiff qualified as Defendants' employee under the ADA and the ADAAA.

75.     At all relevant times, upon information and belief Defendants employed over 500 employees.

76.     Defendants violated the CADA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability by refusing to allow Plaintiff to seek or take leave to treat her actual and/or perceived disability.

77.     Defendants violated the ADA and the ADAAA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived

disability or medical condition by refusing to allow Plaintiff to return to or perform any work after her FMLA leave expired around June 23, 2020.

78.     At all relevant times, Plaintiff was disabled, as she suffered from breast cancer, including its treatment and recovery therefrom, which constituted an actual or perceived disability or medical condition that substantially limited her in one or more of her major life activities, including, but not limited to eating, sleeping, thinking and concentrating and working.

79.     At all relevant times, Plaintiff was a qualified individual with a disability as she satisfied the requisite skill, experience, education and other job-related requirements of the position of Lifestyle Host/Producer and she could perform the essential functions of her position.

80.     Plaintiff was disabled or Defendants perceived or otherwise regarded Plaintiff as being disabled.

81.     On June 24, 2020, Defendants terminated Plaintiff's employment on the day after her FMLA leave expired and while she was still on STD leave.

82.     It is unknown whether Plaintiff's position was filled, but if it was, upon belief the person who replaced Plaintiff was less qualified, non-disabled, was hired at a lesser salary, and had not taken FMLA leave.

83.     Plaintiff provided Defendants with sufficient information that, under the circumstances, they are deemed to have known about Plaintiff's actual and/or perceived disability and her desire for accommodation, including her prior work for Defendants while she was on FMLA and STD leave.

84.     Any accommodations Plaintiff would have utilized (such as working remotely, using technology to complete her duties) posed no undue hardship to Defendants.

85.     At all relevant times and as alleged above, Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

86.     As a direct and proximate result of Defendants' unlawful termination and/or failure to accommodate Plaintiff's actual and/or perceived disabilities, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

87.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

## SECOND CLAIM FOR RELIEF
## CADA C.R.S. § 24-34-402(1)(a)
### Disability Discrimination, Retaliation, Failure to Accommodate
### Against All Defendants

88.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

89.     At all relevant times, Defendants, jointly and/or individually, qualified as employers and Plaintiff qualified as Defendants' employee under the CADA.

90.     Defendants violated the CADA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability by refusing to allow Plaintiff to seek or take leave to treat her actual and/or perceived disability.

91.     Defendants violated the CADA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability or

medical condition by refusing to allow Plaintiff to return to work after her FMLA leave expired around June 23, 2020.

92.     At all relevant times, Plaintiff was disabled, as she suffered from breast cancer, including its treatment and recovery therefrom, which constituted an actual or perceived disability or medical condition that substantially limited her in one or more of her major life activities, including, but not limited to eating, sleeping, thinking and concentrating and working.

93.     At all relevant times, Plaintiff was a qualified individual with a disability as she satisfied the requisite skill, experience, education and other job-related requirements of the position of Lifestyle Host/Producer and she could perform the essential functions of her position.

94.     Plaintiff was disabled or Defendants perceived or otherwise regarded Plaintiff as being disabled.

95.     On June 24, 2020, Defendants terminated Plaintiff's employment on the day after her FMLA leave expired and while she was still on STD leave.

96.     It is unknown whether Plaintiff's position was filled, but if it was, upon belief the person who replaced Plaintiff was less qualified, non-disabled, was hired at a lesser salary, and had not taken FMLA leave.

97.     Plaintiff provided Defendants with sufficient information that, under the circumstances, they are deemed to have known about Plaintiff's actual and/or perceived disability and her desire for accommodation, including her prior work for Defendants while she was on FMLA and STD leave.

98.     Any accommodations Plaintiff would have utilized (such as working remotely, using technology to complete her duties) posed no undue hardship to Defendants.

99.     At all relevant times and as alleged above, Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

100.     As a direct and proximate result of Defendants' unlawful termination and/or failure to accommodate Plaintiff's actual and/or perceived disabilities, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

101.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**THIRD CLAIM OF RELIEF**
**Violation of FMLA 29 U.S.C. §§ 2601 *et seq.***
**Discrimination and Retaliation**
**Against All Defendants**

102.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

103.     At all relevant times, Defendants qualified as Plaintiff's employer and Plaintiff qualified as Defendants' employee under Title VII, given that Defendants had 50 or more employees.

104.     Plaintiff worked for Defendants for over one year and worked in excess of 1250 hours in the 12 months prior to her need for FMLA leave, which she did qualify for and was afforded.

105.     As alleged, Plaintiff was disabled and suffered from Serious Medical Conditions resulting from her breast cancer.

106.     At all times, Plaintiff's position did not require Plaintiff to be in the office to perform her primary duties, as confirmed by other employees/ on air personalities working from home and the outline of job duties identified above.

107.     On June 24, 2020, while on approved leave, and after taking weeks of FMLA, Defendants informed Plaintiff that her employment was terminated.

108.     According to Defendants, it was Defendants' policy to terminate employees who had not returned to work when their FMLA leave concluded.

109.     Defendant terminated Plaintiff in retaliation for Plaintiff taking FMLA leave.

110.     At all relevant times Defendants targeted Plaintiff because she exercised her FMLA rights, and treated her differently than those employees who did not exercise their FMLA rights.

111.     Defendants only reason for terminating Plaintiff was because Plaintiff took FMLA leave.

112.     29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

113.     Defendants' actions constitute FMLA discrimination and retaliation as they adversely impacted Plaintiff and her employment with Defendants.

114.     Defendants' actions and omissions violated Plaintiff's rights under the FMLA, which prohibit discrimination and retaliation.

115.     As alleged above, Defendants caused, allowed, and/or condoned Plaintiff's rights under the FMLA to be violated.

116.    As a direct and proximate result of the conduct of Defendants, Plaintiff's employment was adversely impacted, including termination, and she suffered economic and emotional damages, including anguish and distress, loss of income, loss of employment-related opportunities such as experience and increased reputation, and other special and general damages, all in an amount to be proven at trial.

117.    At all relevant times and as alleged above, Defendants acted maliciously and willfully as it knew its conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether its actions were prohibited under the law or not.

118.    As a direct and proximate result of Defendants' unlawful termination Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

119.    Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**FOURTH CLAIM FOR RELIEF**
**Invasion of Privacy - Misappropriation – Right of Publicity**
**Against All Defendants**

120.    Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

121.    "[T]he elements of an invasion of privacy by appropriation claim are: (1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred." Joe Dickerson & Assocs., LLC v.

Dittmar, 34 P.3d 995, 1002 (Colo. 2001).[2]  A defendant may be liable when he appropriates the plaintiff's name and likeness for his own purpose and benefit, regardless of whether he realizes any pecuniary gain. Id.

122.    At all relevant times Plaintiff has been a person of notoriety, especially in and around Colorado Springs, Colorado, given her years of work as an on-air personality at FOX21.

123.    At all relevant times, FOX21 benefited from its association with Plaintiff, who had earned goodwill, notoriety, a liking, and a following from FOX21 viewers.

124.    At all relevant times, Plaintiff's name, image, and likeness had value to Plaintiff and Defendants.

125.    As plead herein, Defendant appropriated the reputation, prestige, social, or commercial standing of Plaintiff's name or likeness.  More evidence exists capturing Plaintiff's appropriation, but those contained here clearly demonstrate that Defendant used Plaintiff's name and image well after it had terminated her.

126.    As plead herein, the use of the Plaintiff's name or likeness was for the Defendant's own purposes or benefit, commercially or otherwise.  As demonstrated, Defendant continued to promote its Living Local program with Plaintiff's name, image, and likeness well after her June 2020 termination, for the purposes of, *inter alia*, generating business from Plaintiff's goodwill, keeping or adding viewers based on Plaintiff's presence, not revealing Defendant had terminated

---

[2] "In order to prevail on a Colorado state law tort claim for appropriation of name or likeness, a plaintiff must establish: "(1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred." Hill v. Pub. Advoc. of the United States, 35 F. Supp. 3d 1347, 1355 (D. Colo. 2014) (citing Joe Dickerson & Assocs., L.L.C. v. Dittmar, 34 P.3d 995, 997 (Colo.2001)).

Plaintiff – suffering from cancer – months prior (which would have undoubtingly brought criticism and loss of viewership to FOX21 specifically and generally), and even just saving money on taking new promotional photographs and modifying the social media and its website accordingly.

127.    Plaintiff suffered damages, including, *inter alia*, emotional suffering (e.g., humiliation at the online connection between Plaintiff and FOX21) and loss of opportunities, given that Defendants informed the world via social media/website that Plaintiff was, falsely, still working for them and at FOX21.  At no time did Plaintiff authorize Defendants continued use of her name, image, or likeness in promotional social media and websites after her termination of employment.

128.    Defendants caused Plaintiff's damages herein through their acts of misappropriation of Plaintiff's name, image, and likeness, as pled herein.

129.    In addition, after June 24, 2020, Defendants benefitted from the use of, without Plaintiff's consent, Plaintiff's name, image, and likeness in a variety of ways, including falsely advertising Plaintiff on social media (e.g., Facebook) and its website as a panelist on Living Local and falsely affiliating Plaintiff with Defendants despite the fact that she had been terminated.  These actions were intended to keep or improve ratings for Living Local and FOX21 generally.

130.    If Defendants did not believe that maintaining Plaintiff's name, image, and likeness for months after she was terminated benefitted them, Defendants would have immediately taken down and removed any such affiliation with Plaintiff, which they did not do.

131.    Conversely, if Defendants believed that taking down Plaintiff's name, image, and likeness after she was terminated would have not benefitted them (e.g., raising questions about Plaintiff, her health, her employment with Defendants, and ultimately leading to the public revelation of Defendants' termination of Plaintiff's employment), Defendants would have kept Plaintiff's name, image, and likeness (and affiliation) with Defendants, which they did do.

132.    As a direct and proximate result of the conduct of Defendants, Plaintiff suffered economic and emotional damages, including anguish and distress, loss of income, loss of employment-related opportunities such as experience and increased reputation, and other special and general damages, all in an amount to be proven at trial.

133.    At all relevant times and as alleged above, Defendants acted maliciously and willfully as it knew its conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether its actions were prohibited under the law or not.

134.    As a direct and proximate result of Defendants' unlawful actions Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

135.    Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### Against All Defendants

136.    Plaintiff incorporates by reference the allegations contained in the above-mentioned paragraphs as if fully restated and realleged herein.

137.     As alleged above, to Plaintiff's detriment, it would be unjust for Defendants to be permitted or allowed to enrich themselves from their unauthorized use of Plaintiff's name, image, and likeness, while not requiring to pay Plaintiff any compensation for such unauthorized use.  These circumstances, as described above, would make it unjust for Defendants to retain such benefits.  It simply would be unjust to allow Defendants to benefit from their unlawful taking of Plaintiff's name, image, and likeness, because they are and always were Plaintiff's.

138.     It is estimated that for the approximate nine (9) months that Defendants engaged in the unauthorized use of Plaintiff's name, image, and likeness, Defendants were unjustly enriched no less than $100,000.

139.     At all relevant times while Defendants engaged in the unauthorized use of Plaintiff's name, image, and likeness, Plaintiff suffered damages, both directly and derivatively, as a result of Defendants' unjust enrichment, in an amount to be determined.

140.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

WHEREFORE, Plaintiff prays for the following relief:

A.     Orders and judgments as requested;
B.     Nominal damages;
C.     Economic and compensatory damages, in an amount to be shown at trial;
D.     Consequential damages;
E.     Liquidated damages;
F.     Punitive or exemplary damages, in an amount to be shown at trial;
G.     Statutory penalties for failure to pay wages;
H.     Statutory penalties for a willful failure to pay wages;
I.     Costs and attorney's fees;
J.     Pre- and post-judgment interest at the highest rate allowed by law;
K.     All legal or equitable relief; and
L.     All other legal or equitable relief to which Plaintiff is entitled and/or the court and/or jury deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE TO A JURY.**

Respectfully submitted this 8th day of October 2021.

*s/Christopher G. Wilhelmi*

Christopher G. Wilhelmi
Attorney for Plaintiff
Stinar & Zendejas, PLLC
121 East Vermijo Ave, Suite 200
Colorado Springs, CO 80903
E-mail: chris@coloradolawgroup.com
Telephone: 719-635-4200
Fax: 719-635-2493